case, Advanced Fluid Systems v. Huber. May it please the court. My name is Ron Hicks. I represent what are collectively referred to as the Livingston Parties, which is Livingston and Haven, their president, Clifton Vann, and their former employee, Thomas Apiero. Seated at counsel's table is Jonathan Cohen, who represents Kevin Huber and his company. I'll be representing all the defendants, I'm sorry, all the appellants during today's argument, and I reserve three minutes for rebuttal. So you're arguing for Mr. Huber and his company as well? Correct. On the limited issue, as your honors know, you asked us to address, we've raised a number of issues on appeal, both sides, some in conjunction and some separately. But your honors have asked us to address one issue at today's oral argument, and that question is simply whether or not the Pennsylvania Uniform Trade Secrets Act requires one to own a trade secret before one can sue or state a claim of damages against one's former employee and a subsequent vendor who was actually given permission to use the trade secret by its rightful owner. Mr. Hicks, you characterize this for the Livingston Parties as a matter of standing. Correct. Huber Parties characterize it as an element of misappropriation. Correct. What is your party, what is your position, if you are representing now both parties, and functionally, is there a difference? I don't believe there is functionally a difference. I believe it's a question of whether or not this particular claim, that is, whether or not this particular plaintiff can sue its former employee and the subsequent vendor over trade secret misappropriation when, in fact, the rightful owner of that trade secret actually gave permission to both parties to use it. But are we looking to an element of the offense, or are we looking to whether it's in the zone of interest that the legislature intended to protect? I think it's a question of, it's actually the same question. Is there jurisdictional import to the difference? I don't believe it's jurisdictional import because the jurisdiction of the Diversity Court was based on diversity of citizenship. Then what is the position of standing? Well, our position was that basically this plaintiff was not the right plaintiff. It did not have the ability to sue for this particular claim because it didn't have any rights under the statute to, in fact, sue for it. It gave up all its contractual rights when it, in fact, sold the trade secrets to Virginia Space, which it readily admitted. The case, you know, when the case was filed, AFS stated right in its complaint in paragraph 39, we don't own the legal rights to these trade secrets. That's the reason why the motions to dismiss were filed, because they readily admitted at the beginning in 2009 they had sold all of the rights to these trade secrets to Virginia Space. Not only did they sell all the rights, but they stated that Virginia Space was the exclusive owner of all those rights. Moreover, did they have the right to possess them and to use them? That's what the district court said. Well, under the Trade Secrets Act, all we have to look to see is whether they are, quote, lawful possessors of the trade secrets. Right. And we'll get to that. My question is, as a matter of fact, isn't it the case that they did have lawful possession and that they were entitled to have and use these trade secrets? I would argue that they did not have lawful possession because they signed a contract in 2009 which they gave exclusive right and they assigned all rights to the trade secrets to Virginia Space. They offered no evidence, Your Honor. Didn't Virginia Space have to give them the right to possess and use them? Otherwise, they couldn't affect the contract. They couldn't service the contract. They could give them, Virginia Space was the ultimate owner of the product, though. And there was no, this was not a situation where there was, quote, joint ownership. And there was no other license agreement. They were relying on ownership and not possession. That's what the AFS was arguing, is that they lawfully possessed them as the owner so that they could exclude others from using it. But Judge Jordan's question goes to possession. Right. I'm trying to find out if you've got a position, as a factual matter, about whether they lawfully possessed. Didn't they lawfully possess this? Even if we accepted your assertion that they didn't own them, is it nevertheless the case that they lawfully possessed them? Your Honor, I don't know how one can lawfully possess a trade secret when they have contractually sold it and assigned all rights to another party. Pretty easy. All that has to happen is the person who's got, quote, title, unquote, to it says, okay, listen, you're under a confidentiality agreement. You already know about these things because you developed them. Now, you use them and operate them to my benefit. In other words, you can think of it as a license. You can think of it as a shared possession. But there's possession, even if there's not, quote, ownership, unquote. That's, isn't that, I mean, are you denying that that's what happened here? In fact, that didn't happen here. They didn't possess them. There was supposed to be a confidentiality agreement where those parameters were to be put in place, and AFS and Virginia Space never signed that document. Okay. Signed or not, the district court found that both sides understood that it was to remain confidential. But that, and that's the argument AFS is arguing, that they were, quote, an implied licensee, which was never argued in front of the district court. But even if it was, the case law provides that when you have an express contract, you can't use an implied contract to negate what the express contract says. The express contract here says, and AFS admitted from the beginning, they were not the exclusive owners of this property. So you're saying Virginia Space didn't know that AFS had trade secrets and was using them while they were servicing the guy? That was like, that was a surprise to Virginia Space? I'm not saying that, but what Virginia Space did know. You have to acknowledge that Virginia Space knew they had them, right? Correct. And knew they had them over an extended period of time because they were working with them and using them, right? That's correct. So your argument isn't that they didn't possess them. Your argument is that even though Virginia Space knew it and was working with them, that that possession was not lawful. That's the position? Correct, Your Honor. Because Virginia Space had the ultimate control over the trade secrets. And that's why they also gave permission to my clients to take a look at it, as well as to Mr. Huber to use them. And so that's the issue in this case here. And I think, as this court recognized recently in the Harais case, and I may be mispronouncing that name, and I apologize to the medical center for mispronouncing it. But in Harais, this court recognized, and I think where the district court went awry, was the district court said, well, look, I'm looking at the Uniform Trade Secrets Act, and I can find nothing in the Trade Secrets Act which expressly says that you have to, quote, own the trade secret in order to pursue a claim under the Trade Secrets Act. Right. And yet, we disagree with that. We made the argument before the district court that, in fact, the use of the word of another does, in fact, imply ownership. How does of another mean ownership? Well, of another just means that the alleged thief doesn't have it. It says nothing about whether the person from whom it was stolen had it, does it? Our position was that the of another, especially when you look at the comments, particularly underneath that, under 5302, where it says proper means includes discovery of a license from the owner of the trade secret, that that implied ownership. But even if you're right, Your Honor, that of another doesn't necessarily mean that, then you don't do what the district court did. The district court said simply, okay, well, if the statute doesn't say it, I don't look at what common law says. The district court was quite clear on that. The district court said, I hear you living in Sydenhaven. I hear you, Mr. Huber. I know of all these Pennsylvania cases out there that were part of common law, but that's all common law. We now have a new statute. Let's talk about Jerez for a minute. How does the fact that Pennsylvania's adopted the property view on trade secrets bear on standing here? What goes to the issue of whether or not this particular plaintiff had the ability to sue for misappropriation? So, doesn't the focus on the secrecy of the material itself, rather than the confidential relationship between the parties under which there's the basis of the claim for trade misappropriation, isn't the suggestion that a person knows of the secret material has standing because the damage is done by disclosure? No, the question is whether or not the trade secret is in fact owned by that particular person. Keep in mind that with regard to Pennsylvania's property view, even this court recognized in Moore, that Pennsylvania's view on property law with regard to trade secrets is much more narrow and is very limited as to what plaintiffs can sue for misappropriation. In fact, I think that this... these questions about what Pennsylvania law means goes back to the Van Products case. And the only thing the Van Products case said was that in every case of this sort, and this is the starting point, the starting point in every case of this sort is not whether there was a confidential relationship, but whether in fact there was a trade secret to be misappropriated. That's saying, we'll start not with the question of confidentiality, but we will look at the property claim. But that doesn't mean confidentiality is insignificant or has no part to play. In fact, the case that's cited in Van Products, as soon as it makes that assertion, is the Supreme Court's DuPont case from 1917, which says, it's a very short case, but it says, quote, that whatever they are, the facts, the defendant knows them through a special confidence that he accepted. And it goes on to say, the defendant stood in a confidential relation with the plaintiffs or one of them. The first thing to be made sure of is that the defendant shall not fraudulently abuse the trust. In other words, even in making its comment about where you start, the Van Products case referenced as a direct site, the DuPont case that says, confidentiality and a confidential relationship are important. So, if that's the state of the law in Pennsylvania, why is it irrelevant that there was a confidential relationship between Huber and AFS and that, in fact, AFS possessed these trade secrets? Two responses, Your Honor. First off, in Moore, this court stated on page 570, the Pennsylvania law makes it difficult for a plaintiff to recover under the tort of trade secret misappropriation, suggesting that Pennsylvania would continue to favor the defendant in the trade secret context. It cited, in support of that, the Van Products case. In Van Products, the court, again, recognizing that in Van Products, we were dealing with the issue of whether or not, simply because the former employee had used all the trade secrets, could the former employer sue the employee and the subsequent vendor for misappropriation? And the Supreme Court said, wait a minute, you sold the trade secret and publicized it and sold it to the public and didn't engage in any protection. Very similar to here. Well, no. They sold it. Stop, stop, stop. When you say very similar to here, stop for just a moment. Here, was this a circumstance where the, where AFS publicized the trade secret to the public, sold it in a way, and then had nothing to do with it? Because that's the assertion in Van Products, that they were out of it. Not that they were still in it, but that they were out of it, right? No, no. Actually, in Van Products, they were still in it. In fact, were selling it for 25 years. Our position here is one step removed from Van, and it's actually even more favorable for the defendants, in that this particular plaintiff sold all rights to the trade secret to a third party who gave my clients permission to use it. That's one step removed. In Van, you were dealing with, or in Van Products, you were dealing with a situation where it was just sold to the public, and as a result, the Supreme Court said, okay, wait a minute, you can do reverse engineering. Anyone from the public has a right to reverse engineer. That's what I'm trying to get at. But here, we've got one step removed. We have a plaintiff who has sold it. Sold to the public. Is it, what does that mean, sold to the public? In Van Products, they were concerned with the issue that the trade secret had been released to the public. Right. Again, the question is, could that plaintiff sue those particular defendants because it no longer had the trade secret? Here, we have a situation where this particular plaintiff, Advanced Fluid Systems, sold it, all rights, exclusive property, to the trade secret owner now, space, Virginia Space, who gave my clients permission to take a look at it. Yet, they've come to court saying, we're entitled to sue for misappropriation when we don't own the trade secret. I thought they were coming to court saying that Mr. Huber wrongly took the information. They are. Right. And that's exactly what they said in Van Products as well. They said in Van Products, our employee used our trade secret information against us. I thought in Van Products, we just established that the assertion was, this has become public, you sold it to the public. But that was the central point. And then, when they got to the question of, is there a trade secret at all, they mentioned property rights, but they cite the DuPont case. It's the single case they cite, which emphasizes confidential relationship. No, actually, Your Honor, in Van Products, they say, quote, we feel, this is on page 780, we feel that the authorities holding the public disclosures destroy plaintiff's right to maintain a cause of action to preserve his trade secret as against a competing former employee who has violated a duty of confidence are more sound in theory and practice than those continuing to look at the relationship of the parties as a basis for the action. We feel that the widespread publication and advertising in this case destroys Van Products' rights to maintain a cause of action for breach of duty, not to disclose the trade secret. Mr. Hicks, that's about putting it out into the public, right? Correct. If the Supreme Court of Pennsylvania really meant to say confidential relationships have nothing to do with this, why would they cite the DuPont case, which is all about the importance of a confidential relationship? Because I believe, Your Honor, in Van Products, as even the subsequent Pennsylvania appellate courts have indicated, and I'm sorry, I realize I'm out of time. I assume I can answer your question, Your Honor, is what they're focusing on. In fact, in Van Products, they emphasize, even if the misappropriation was done by improper means, i.e. a breach of a confidentiality, if they're, in fact, if the plaintiff no longer has the trade secret, then there's no basis for a claim for misappropriation. No longer has it. Okay. So, let me ask you this. On DTM research, is your position that that's wrongly decided, and if so, why? Our position is that it's decided correctly if you, in fact, have a confidentiality view of trade secret law. But that's what Maryland law is. But as the Fourth Circuit stated, even after Van Products was originally issued, I believe in the case of several court versus GE, which was a case from the Fourth Circuit in 1968, their position was, quote, if Van Products holds that the mere presence in the public domain of information no longer renders it a trade secret, and that precludes recovery for breach of confidential relationship of the employee, then we decline to follow it. The Fourth Circuit's view was Van Products is a property view case. We're not going to follow a property view. That's what DTM case is. DTM follows Maryland law. Maryland law says we are a confidential view state. We are not a property view state. I recognize Pennsylvania has a very limited view on trade secret law. That's what the common law was. And there's nothing in the Uniform Trade Secrets Act which indicates that when the General Assembly adopted it in 2004, it was intending to throw all of that out the door. And, in fact, as this court indicated in Horaeus, that that wasn't the case. Okay. We've got some questions here. So, in Horaeus itself, we were looking at the question of whether the breach of confidentiality only occurs on the initial misappropriation or it's something that is continuous, right? But in the discussion there and in my citation to Chief Judge Becker, we continue to talk about the importance of the confidential relationship itself, right? We didn't foreclose, we didn't suggest that there wasn't significance to the trade secret being confidential. We were talking about whether it was in terms of the property approach versus confidentiality approach, whether you looked at it as a one-time occurrence or something that was a continuous occurrence. Your Honor, as I read your opinion, the way I read Horaeus is that the first question is, is Pennsylvania a property-view state or a confidentiality-view state with regard to its trade secrets? That's as relevant to the issue that was presented to us in Horaeus. Well, but I think it's also relevant to the question here because the district court took the opinion that I have to interpret the Uniform Trade Secrets Act by ignoring Pennsylvania prior law and instead just read what this statute says. And if I can't find any Pennsylvania Supreme Court decision on what this statute says, then I look to federal court decisions. And Horaeus, Your Honor, indicated that's not the proper approach. This body is here to figure out what the Supreme Court or predict how the Supreme Court will, in fact, address this issue. And in order to address that issue, you don't look at pronouncements of other federal district courts on the issue. But more importantly, you don't throw out common law. You can if you're looking at the Uniform Trade Secrets Act. And the linchpin of your argument that the DTM case is irrelevant is that it's Maryland, that's confidentiality, and Pennsylvania doesn't care about confidentiality. It doesn't matter. That's sort of the linchpin of your argument, right, that those statements in Vann Products that cite the DuPont case, that's really irrelevant because the only thing that matters is ownership. Ownership, ownership, that's it, doesn't, confidentiality just doesn't come into it. We didn't suggest that in Horaeus, did we? No, yes, Your Honor, you did. You indicated the Pennsylvania courts have adopted the property view of trade secrets under which the basis of the claim is the violation of the property right, not the confidential relationship. That's where I'm quoting from on, specifically on page 738. And it's the property view. Statute of limitations and whether they, it's a one-time event or continuing wrong, right? But it was also on the question of which view applies. Is it the confidentiality view or is it the property view? And this court was addressing the question of whether or not the adoption of the statute negated common law. And this court ruled it did not, that the common law still was applicable. As an initial matter, we look to the text that was adopted by the Pennsylvania legislature. Correct. And we look to the commentary. Correct. And here we have, as statutorily directed by Pennsylvania, we look to the commentary to construe Pennsylvania's version of the UTSA and three times in the commentary the drafters are stating that more than one person can be entitled to trade secret protection, it's just damages are awarded to the one from whom it was actually misappropriated. Doesn't that make clear that Pennsylvania, with the indications that we have looking to the commentary that we are statutorily required to consider, make ownership secondary to possession? If there's lawful possession, and I have a question for you on that too, then if we're going to follow the commentary, doesn't that end the inquiry? Actually, Your Honor, the commentary doesn't indicate, and we disagreed with the district court on its interpretation of the commentary as well. Those comments just simply recognize what this court recognized in NOVA, which is you could have more than one owner of a trade secret. You know, if Virginia, I mean, if the contract was originally written between AFS and Virginia Space where they would co-own the trade secrets, then AFS would have ownership. But that's not what they did here. They sold all rights and gave exclusive rights to only one party, Virginia Space. Moreover, they didn't, Virginia Space didn't give up its ownership interests. So we've got your position on ownership. Let's ask about possession. You had another one, another question? Well, on the question of confidentiality, we have here again, we're, as I know you were sitting through the last case, but we have here some undisputed facts too. We've got findings from the district court that there was an understanding of confidentiality and that AFS closely safeguarded its proprietary information. And it unveiled its engineering documents no more than necessary to support design, installation, maintenance, and operation of the system. The evidence simply doesn't substantiate defendants claim that AFS's materials were shared so freely as to dilute their competitive value. Aren't we bound by those findings? Yes, but those findings don't go to the issue of what you really need to look at is, was there an understanding by Orbital that they didn't have exclusive control over this product and they were the ones who had to decide who was going to see them or not? There is no testimony from Orbital or anybody that Orbital and Virginia Space understood that they no longer had the right to make that decision and instead that AFS had that right. Remember, as this court indicated in Nova when it talked about licenses. That doesn't speak to lawful possession though, right? You're just saying. It does. Well, you're saying that the fact that they owned it, if so facto means AFS couldn't have lawfully possessed it. Correct. Wow. Yes, sir. That's remarkable. So, okay, good. Well, we've got your argument and we'll hear from your opponent. Robert LaRocca for Advanced Fluid Systems. Thanks for giving us the opportunity to give you our views on this interesting issue. Let me start with a statement that my colleague made about Maryland law. I think he was misinformed. Maryland takes the position like Pennsylvania that trade secrets are property interest. And there's a Fourth Circuit case that says that it's Tobacco Tech versus Tega 388F Federal Appendix 362. It's Fourth Circuit 2010 and at page 369 they say, quote, in Maryland the law of trade secrets gives a person a property interest in the trade secret. And that, of course, was the law that DTM research was construing. Let me ask you about possession. If we assume for the sake of discussion that there was lawful possession by AFS, I'm nevertheless interested in the assertion that I think you make in your briefing that, well, let me actually quote it to you. You say, quote, and this is on page 47 of your brief, AFS had the right to prevent Virginia Space, you use an acronym for it, from assigning contractual rights to anyone else without AFS's express approval. And you cite to the appendix at 1165 paragraph 15. As if to say AFS retained some rights in this. But the thing that you cite when I looked at it is one sentence that says, non-assignment, neither party may assign or otherwise transfer its rights, duties, and or obligations under this agreement without written consent of the other. It doesn't, I'm wondering how you get from that statement, which is a pretty boilerplate statement about nobody gets to assign something that they don't have, to AFS had the right to prevent Virginia Space from assigning contract rights to anyone without AFS's express approval. Judge, I'm not, I may have overstated in the brief, and that's not the main focus of why I think we have standing under DTM. But you're not trying to claw in some ownership statement. Does that look like an ownership statement? No, I apologize if I gave that impression. I was just pointing out, I mean, we did retain certain rights under the contract. They were pointing to the one paragraph that they kept seizing on. And I wanted to say, well, there are other parts of the contract. There is a non-assignment provision. I don't think it's particularly strong or germane in this context. I think that what's really, what's really the focus of our argument is DTM research, the Fourth Circuit, construed the exact same language that the Pennsylvania. Maryland law, though. No, well, the Maryland. Maryland law against background of Maryland common law. So, why are they wrong when they say, that'll tell you maybe something, but not much, because the background of Maryland common law is different than the background of Pennsylvania common law. Well, they both have a, as I just read, they both take a property, the same property interest in a trade secret. And I think that the issue here is, what does, what does the Uniform Act say? I think the Uniform Act expanded on the common law of all jurisdictions. I don't think it repudiated the idea of ownership, but I think that the central insight of DTM research is that ownership means something different than just title, legal title. Ownership means, as DTM research said, knowledge, secret knowledge, that you're maintaining secret knowledge. And that's why people in possession can share it. DTM, how about a circumstance, Mr. LaRocca, where somebody who had no hand in creating, no hand in developing, but who came in lawfully into possession of a trade secret. Imagine a circumstance, I don't know, a closely held corporation, and it's got 15 stockholders, but all the stockholders have possession of some trade secret information, whether it's business lists or technical, what you pick it. Is the, and one of those 15 has it stolen from them. Is that a, even though there's not an ownership interest in the sense that the person from whom it was stolen actually owns it, it's owned by the corporation. It's not owned by the individuals. Are they a lawful plaintiff? I don't know. I mean, they might be. I think it would depend on the. What's your rule, right? Because the rule you're pressing us to take is if you've got possession, any kind of lawful possession, no matter how you came into it, you're a lawful plaintiff. If you have lawful possession, I mean, there are three requirements. You have to have lawful possession of something that qualifies as a trade secret. My hypothetical assumes that. Right. And it has to be taken from you by improper means. That's the second statute. That's the second statutory requirement. And, and you have to suffer actual loss from that misappropriation. So I don't know, you know, we could, I don't know the exact contours of your, of your shareholder, but yes, I think if the shareholder suffered, have lawful possession of this, he is in the corporation. He has lawful possession by virtue of his status within the corporation. It's stolen from him and he has suffered actual loss from the misappropriation. Then I think those are the three requirements under PUTSA. And I would argue, yes, he would have standing. He would have, he would have an ability to assert a claim. Now you can, you know, run out other hypotheticals that get you to the absurd one. What I thought was, well, suppose, you know, Martinez and Turek that made that big strong back structure that, that helps push the rocket up on the launch pad. They had the rights to our, our drawings because they're the two interfaced, our hydraulic cylinder and that strong back structure. Well, suppose they had, you know, our drawings in their shed overnight and Hoover stole it from their shed as opposed to taking it from us. Yeah, you know, you can get sort of what I would call not silly hypotheticals, but it, you know, it was technically taken from Martinez and Turek, but there are drawings. I think what you would look to is who has suffered the actual loss? Who is the target of the misappropriation? Right? That's the limiting principle. Yes, I think it is. Well, it's, it's one of the requirements of PUTSA. As a general matter, Pennsylvania has adopted the view of the restatement of torts first. Yes. Well, before, before PUTSA. And the, the restatement says, that restatement says quite clearly that the misappropriation rule applies to improper means in procuring the secret, not only from the owner, but also from any third party holding the secret under a duty to the owner, not to disclose it to others. Thus, the rule applies to a theft of the secret from an employee of the owner or a post office or a bank or any other party to whom the secret was entrusted in confidence. Does that, does Pennsylvania's reliance on the restatement of first and that position in the restatement inform our understanding of the, of PUTSA? I think it's certainly consistent with it, your honor, with the passage that you just read. And I would like to make this additional point along those lines. You referred twice in the, I'm going to call it SCAM because I don't know how to pronounce the plaintiff's name, in the SCAM opinion to the 1985 final version of the amendments to the Uniform Trade Secret Act. And this was what was adopted and sent out to all of the states for consideration. On page 14 of that document, they deal with what you, the split between the states on the statute of limitation issue, the question that you are addressing in SCAM. But here's what they say on page 2. And I think this is interesting. They say the Uniform Act codifies the basic principles of common law secret protection, preserving its essential distinction from patent law. Under both the Act and common law principles, for example, more than one person can be entitled to trade secret protection with respect to the same information. So this was a fundamental structure of the Uniform Act, what became codified in the formal comment that we have now in 5304 of PUTSA. But your colleague, I'm going to say, the IO would have us read that as other persons who are co-owners. Well, how do you know it means others in possession are entrusted  Well, it doesn't say that explicitly. But I think that's where DTM perceptively interpreted that way. And I think that's the correct interpretation. But, you know, under patent law, it's very clear the patentee has the right to sue. Patentee or legal successors have the right to sue. And that's the same thing when the other federal registration acts, the Copyright Act, it's the legal and beneficial owner, the trademark, it's the register of the mark. The Uniform Act very deliberately took a different tack in what I just read to you and what appears in the end, and it's carried through in the language why they use, you know, of another in 5302, and the complainant has the right to sue. Well, what do we speak directly to the assertion that you really you didn't have a lawful possession? I mean, you were, you had assigned every bit of your rights away, and you may have had it at the grace, maybe the forbearance of Virginia Space and Orbital, but you didn't have any claim to or lawful possession of it. Your Honor, we developed this invention. We stamped the answer to that. So I mean, we sold it. Well, it was a work for hire, as Chief Judge Connor recognized. I agree with that. So what does what does we develop that have to do with anything? Because lawful possession, but the Virginia Authority testified that they considered them our trade secrets. This is in our brief at pages 64 and 65. The Virginia Authority testified they considered themselves legally bound to preserve them as our protect them as our trade secrets. There's a Virginia statute that's also consistent with that. They said we wouldn't disclose them. I mean, they considered them to be AFS's trade secrets, not not VCSF's trade secrets. I grant you that contract would have given the Virginia Authority the right to be the patentee or the copyright owner. And it speaks specifically about patents and copyrights. Not just to be the owner in the sense of other kinds of intellectual property, but the owner in the sense of this intellectual property. Once they bought it from you, they could do whatever they want with it. There's no reservation of rights in that contract that I saw. If and in fact, they were operating under a public records law, which if somebody else had come in and said, we want to see it, they could have seen it. Right. But why does giving legal title deprive you of lawful possession? It's sort of you don't get to ask us questions. We ask you. So the question being put to you is, since there was no reservation of rights, Virginia Space could have done anything with that at that point. And you wouldn't have been in a position to stop them and say, hey, that's mine. Would you? No. OK, if that's the case, then you really do have to concede that there's there's your entire claim here is premised on the notion that they were letting us have it and letting us hold on to it. And so we had a lawful possession. All right. Let's assume that that's a basis on which you can make your your claim. I'll let him. How how do you make your other claims, your the other elements of Pennsylvania Uniform Trade Secret Act stick, including the assertion that we had we suffered a compensable loss if you had no right. To keep them and to own them, to to own the property, how how do you have a compensable loss if somebody else gets it? Your Honor, they were used by our former employee in Livingston to deprive us to take away illegally two contracts where we were the incumbent vendors. So we clearly had a loss from the misappropriation. We had lawful possession because the Virginia authority, the whole essence of the contract, was that we were to develop these trade secrets for the Virginia authority, keep them secret, give them only to the Virginia authority under this. What's in this is in part three of our brief about the secrecy where they honored the secrecy of it. Well, here we're in a little bit of an awkward position because maybe Mr. Hicks and his colleague are precisely in alignment on this. But you might have had some rights against Mr. Huber for a breach of an employment contract or a breach of confidentiality associated with that. But how do you have rights against the Livingston folks if you had no right to stop the information from getting out and it got out? Your Honor, in DTM research, that was AT&T's whole argument. The DTM gave all of its rights to the federal government. It retained nothing. And so is that what you're saying would have applied there? You know that. Well, how could DTM have asserted a trade secrets claim? And the Fourth Circuit held, as you know, it's lawful because that discovery or lawful possession are what give you the right to assert a Uniform Act claim. OK. And by the way, in the 10th Circuit, subsequent to that, in the Goodecky Holdings, joined forces with it with the Fourth Circuit. And that was another case where the person suing had retained no rights at all, but had lawful possession. OK, great. You're not arguing, though, that Livingston here had violated the law by accepting the documents itself. I thought your argument, in essence, was based on the district court's findings that Livingston did so, acquiring the documents from Huber, a known employee of the firm against which Livingston was actively competing. And they weren't merely passive recipients, but had solicited the documents from Huber. Right. That's a page, I think, 61 of the joint appendix. Yes, that's where he finds that they were misappropriated by unlawful acquisition. Livingston did. And that, yes, that's what he found. Yes. And that's fully supported by the record. All right. Thank you. Thank you. We will hear from Mr. Hicks on. Thank you, Your Honors. With regard to the issue of whether you call it ownership or lawful possession. Let me see if I can try to make them make our position clear on this issue. Whether AFS had the right to possess the trade secrets after they sold them to AFS, the question is, is, yes, they had a right to use them for Virginia Space's benefit. But the question here is, that's not what AFS is suing us for. They're not suing us because we used the trade secrets against Virginia Space. In fact, there's no dispute that we use the trade secrets to benefit Virginia Space, the rightful owner. What AFS is arguing is that they have a right, despite the fact that the lawful owner of the trade secrets. Wanted us to use them, they have a right to sue us for having used them. I think. And so that's the question here is, yes, they have law. They may have had possession because Virginia Space gave them permission to use those trade secrets for Virginia Space's benefit. So you are acknowledging, Mr. Hicks, that they had lawful possession then? They had possession for Virginia Space's benefit. And they had that possession lawfully. Well, whether it's lawful or not, the question is, is whether or not they had the right. Problem with conceding that. Well, because there's a contract here which gave exclusive rights over to Virginia Space. But it allowed them to have lawful possession. We're puzzled by why you're fighting that. Well, we'll set that aside. I don't know whether it because I guess the question is, is whether or not when you give exclusive rights over to one party and there's no corresponding license back to AFS, which there isn't in this contract, there is no licensing back to to AFS. There's no written license back, but there's clearly a de facto license and that they expect them to be using them for their benefit, as you just said. Correct. And but that contract expired in 2012 before they sued us. And so that at that point, they didn't have any lawful rights to possess the trade secrets. That's my that's my hesitation. What do we make of the of the point that Mr. LaRocca says, which is Virginia Space's own authorized representatives say we recognize these as as information in which AFS had a trade secret interest. Is ill-informed and irrelevant that as well as the fact that they can't change the written contract, you know, if they're trying to introduce that to change the written contract, there's a number of different theories which would preclude that they signed a contract which they have readily admitted, undisputedly gave 100 percent of all the trade secret rights over to AFS. And more importantly, have you ever seen anything in the record where Orbital says, yes, AFS, AFS has the right to exclude others from using these trade secrets, even for those that we designate to use for our own benefit? There is no such evidence because Virginia Space didn't believe that Virginia Space testified that they thought they had the right to give these contracts to Livingston Haven or any other subsequent vendor because it was their property. Did Virginia Space know that that information was being used in a way that would cause them to pay higher prices because they would be overbid because Mr. Huber was going to be sabotaging, actively sabotaging AFS? Was that was that for Virginia Space's interest and benefit? No, Your Honor. But again, I think everybody knew that at least Livingston and Virginia Space. No, no one was aware that that had happened. All right. Thank you, Mr. Hicks. Thank you, Your Honor. We appreciate counsel's argument.